Penny M. SOBBA, Plaintiff,

v.

PRATT COMMUNITY COLLEGE & AREA VOCATIONAL SCHOOL, a Kansas Community College, Defendant.

No. 99–1149–WEB.

United States District Court, D. Kansas.

Aug. 22, 2000.

**1044**

Paul S. McCausland, Young, Bogle, McCausland, Wells & Blanchard, Wichita, KS, for Plaintiff.

Alan L. Rupe, Kelly J. Johnson, Husch & Eppenberger, Wichita, KS, for Defendant.

### Memorandum and Order

WESLEY E. BROWN, Senior District Judge.

Between 1994 and 1998, plaintiff Penny Sobba was employed by Pratt Community College ("PCC") as a residence hall supervisor, as coach of the school's men's and women's tennis teams, and as an adjunct faculty instructor. In 1998, the small, all-female residence hall that plaintiff had been supervising was closed, and PCC notified plaintiff it was re-assigning her to supervise the only other dormitory available to her—a large, all-male residence hall that was difficult to supervise. Plaintiff rejected the position. Shortly thereafter, PCC rescinded its contract offer to plaintiff to coach the tennis teams for the 1998–99 school year. In this action, plaintiff alleges that PCC violated the Equal Pay Act by paying her less than male coaches in similar positions, and that PCC engaged in unlawful gender discrimination in violation of Title VII by discriminating in wages and by terminating her contract to coach tennis.[1] The matter is now be-

---

1. Plaintiff does not claim that the reassignment to another dormitory position was done on account of gender. Nor does she assert that the termination of her residence hall contract was done on account of gender. *See* Pl.Mem. at 1–2.

fore the court on PCC's motion for summary judgment. At a hearing on the motion on August 21, 2000, counsel for the parties agreed that the matter could be submitted on the briefs.

### I. *Facts.*

In keeping with the standards governing summary judgment, the following facts are either uncontroverted or, when controverted, are viewed in the light most favorable to the plaintiff.

Penny Sobba worked for PCC from August 16, 1994, through the end of the 1997–98 school year. Plaintiff had experience in teaching tennis, physical education and coaching, and had a Masters in Science with emphasis in athletic administration when she was hired at PCC in 1994.

In the summer of 1994, plaintiff wanted to get a job coaching tennis with a junior college or college. She telephoned PCC and asked about openings. Someone at PCC described several coaching positions in various sports and mentioned a dorm supervisor position. At that time, the tennis coaching position was held by Greg Wade, an instructor at PCC. The tennis coaching position was not advertised to be filled.

Plaintiff had two interviews at PCC: one with Janice English, the school's residence hall supervisor, and another with Don Schwartz, the athletic director. When Sobba interviewed with Schwartz, they talked about tennis and track coaching positions and Sobba's desire to teach in the physical education department. English later called Sobba and offered her a residence hall supervisor position. She did not offer plaintiff a coaching position. Sobba verbally accepted the residence hall position. Later, Sobba had a call from Brent Kirkhart, the track coach, about taking an assistant track coach position and doing the tennis program.

On August 23, 1994, plaintiff signed three employment contracts with PCC.

One of the contracts, for the residence hall supervisor position, paid $7,675.00 annually and provided various benefits. It was classified as a "Professional" position and was designated as a .75 FTE ("full time equivalency").[2] The other contracts were for positions as assistant track/cross country coach and tennis coach. These positions, which paid $3,000 and $1,260 respectively, were classified as "supplemental" and were not assigned any FTE value in the 1994 contracts. Plaintiff also signed an adjunct faculty contract to teach physical education courses.

PCC's employee handbook contains a statement asserting that the school's policy is not to discriminate on the basis of sex in employment and it directs any person having complaints relating thereto to immediately report them to the Personnel Department. Plaintiff signed a form acknowledging she had read the handbook and would be bound by its terms.

In the summer of 1995, plaintiff's coaching duties were reclassified as head coach of the men's and women's tennis teams. The tennis coach position was designated as a .25 FTE and plaintiff was compensated $4,260.00, an amount equal to what she had been paid when she was coaching tennis and assisting with track and cross country. The residential supervisor position continued to be designated as a .75 FTE position. Plaintiff received a raise for that position to $7,982 annually. Although plaintiff attempts to controvert PCC's assertion that the residential supervisor position was her "primary job," plaintiff cites nothing to controvert the portions of the record showing that PCC conveyed to her that the supervisor position was to be her first priority. *See e.g.* Sobba Depo. at 383 ("They were always stressing to me that my dorm job took priority to my coaching . . . .").

During the 1996–97 academic year, plaintiff was paid $8,322 for her residential

---

**2.** All positions at PCC are measured on a "Full Time Equivalent" (FTE) basis. For example, a half-time position is equivalent to a .5 FTE, while a one-third position is equivalent to a .33 FTE. Def.Mem. Exh. L.

supervisor duties. She was also paid $7,175 for her tennis coaching duties (a raise of nearly 70%). These positions remained designated, respectively, as .75 FTE and .25 FTE positions. Plaintiff received additional compensation for adjunct teaching functions.

During the 1997–98 academic year, plaintiff was paid $8,655 for her residential supervisor duties. She was also paid $7,462 for her tennis coaching duties. Plaintiff received additional compensation of $2,400 for adjunct teaching functions.

Throughout her employment at PCC, the teaching duties plaintiff performed were compensated under separate adjunct faculty contracts. The pay for such duties was calculated according to a schedule which paid "x" amount of dollars per credit hour, depending upon the number of semesters of service the employee had completed. In plaintiff's case, she received $300 per credit hour because she had taught fewer than nine semesters.

As part of her compensation, plaintiff received free board and lodging from PCC as well as insurance and benefits for the full 12 months of the year. The value of her insurance benefits ($1,945) and board and lodging ($2,400) was approximately $4,400, making her entire compensation package for the 1997–98 school year approximately $22,287.

PCC's tennis program was revived by Jack Ewing. At the time he reinstated the program, Ewing was the director of student activities for PCC. For the first year or so, Ewing coached the tennis team for no additional compensation. Eventually, a PCC instructor, Greg Wade, took over coaching duties. Wade volunteered, but in 1992–93 he was compensated at the amount of $1,260 per year. This level of compensation continued through plaintiff's first year as tennis coach.

In May of 1996, plaintiff had asked for more teaching and coaching responsibilities and a salary increase, asserting that a head coach should be making more than any assistant coach position. Dr. Wojciechowski told her at that time that "she could continue as dorm supervisor and we could get another tennis coach if she felt the salary was unfair."

Plaintiff's replacement after her termination in 1998, Jason Kennemer, was hired in June of 1998 for the residence hall and tennis coach positions under contracts providing him the same salary plaintiff had received. Kennemer also received a supplemental payment of $1,000, which covered the period July 1 to August 14, 1998. Kennemer's residence hall supervisor contract, although signed in June, did not take effect until August 15, 1998. Kennemer had no prior experience in dormitory supervision or as a tennis coach.

Defendant's Memorandum in Support of its Motion for Summary Judgment contains a list of coaches and assistant coaches at PCC during the 1997–98 school year. Rather than repeat the list, the court will simply incorporate it here by reference. The court accepts as true plaintiff's allegation that the FTE's assigned to these various positions did not necessarily reflect the amount of time actually spent by the coaches on these jobs, and that many coaches devoted a majority of their working hours to their respective sports.

Plaintiff asserts in her response that PCC assigned male coaches to "fluff jobs" like academic advisor, assistant athletic director, and intramural sports director, "causing male coaches to be more highly compensated without significant additional work," while women coaches "were required to work significantly longer hours in real jobs like academic teaching assignments and residence halls...." The court cannot accept these allegations as properly supported by the record. The assertions are based on the affidavit of Debra Brant, the former volleyball coach at PCC. As the defendant correctly points out, this witness' personal opinions or beliefs that PCC engaged in sex discrimination do not suffice to establish a genuine issue of fact. Plaintiff has not shown that the assertions of this witness are based on her personal knowledge of the qualifications and re-

sponsibilities of the various positions or the time, effort and skills required to perform them. Nor has plaintiff shown that this witness has any personal knowledge of the school's reasons for hiring the individuals in question for these positions.

The functional responsibilities listed by PCC for plaintiff's job as head tennis coach were essentially the same as those listed for head coaches in other sports.

Some sports other than tennis at PCC competed year-round. Tennis had a fall scrimmage season, with its Jayhawk Conference schedule in the spring.

The tennis program does not maintain its own court. It uses the courts at the Pratt City Park. The tennis program also has minimal equipment expenses. The students provide their own rackets.

Tennis has fewer participants than most other PCC sports programs and it recruits almost entirely within the Pratt area. Plaintiff's recruiting was limited by budget and by the number of available scholarships. These limitations made it difficult to compete for top athletes.

Plaintiff received positive comments on her performance as tennis coach in evaluations from the athletic director and in comments from the President of PCC.

At the time of plaintiff's employment as the tennis coach, Rocky Patterson was the head coach of the rodeo program. He had more athletes to supervise and manage, a substantially larger budget, more equipment to maintain (including livestock and riding gear), and had to attend to an indoor and outdoor arena. PCC has some of the best rodeo facilities in the region. The rodeo team has an excellent reputation and attracted athletes from throughout the country.

At the time of plaintiff's employment as tennis coach, Brent Kirkhart coached track and cross country. The track coach is expected to train and have knowledge in over a dozen individual events in which participants compete. Kirkhart had an assistant coach for track and cross country. The track and cross country programs are separate programs with separate meets. In the spring of 1997, there were 24 eligible track athletes at PCC. In the spring of 1998, there were 16. Cross country had 11 eligible athletes in the fall of 1996, and 8 in the fall of 1997.

At the time of plaintiff's employment as the tennis coach, Ed Wilkerson was the softball coach. During his tenure, Wilkerson advanced the softball team to nationals. No tennis players advanced to nationals during plaintiff's tenure. The softball team had a budget more than twice as large as tennis and had approximately twice as many play dates. The softball coach is responsible for preparing the field and taking care of it.

The baseball program has approximately 25 participants and recruits out of state. PCC maintains its own baseball field and the coaching staff has grounds-keeping duties. The budget for baseball was more than four times as much as tennis, and the schedule included 30 play dates in the spring of 1998.

Men's and women's basketball have 15 participants each and are considered major sports at PCC. Compared to tennis, more money is spent for basketball facilities and recruitment.

Plaintiff and Janice English did not get along. English frequently complained that plaintiff's tennis duties were interfering with her duties at the residence hall.

Following the 1997–98 school year, the hall that plaintiff supervised, Porter Hall, was scheduled to be converted to office space and an expanded child care center. At the time of plaintiff's reassignment, there were three halls available for assignment: Novotny Hall (all male), Scholarship Hall (all female), and North Hall (co-ed). Novotny Hall was the only dormitory available for assignment to plaintiff. At that time, all of the residence halls were supervised by females.

Plaintiff was not assigned to the new co-ed hall, North Hall, because it was going to be a twelve-month dorm, and that posi-

tion would be a 1.0 FTE. This hall was reserved for the housing director, plaintiff's boss, who was also female. Plaintiff was not assigned to the Scholarship Hall because the supervisor for that hall, Jana Burrough, had rheumatoid arthritis and remained at the one-story hall in order for PCC to accommodate her disability. As a result, plaintiff was assigned to the only available dormitory, Novotny Hall.

There were problems with discipline in the all-male Novotny Hall. Dr. Wojciechowski admits that it was a difficult assignment for any supervisor. Porter Hall, where plaintiff previously supervised, had 33 female students, whereas Novotny had 125 male students. There were occasions at Novotny when it was necessary to call in male coaches to control male athletes. Three women supervisors at Novotny had previously resigned. In a discussion with the President of PCC, Dr. Wojciechowski, in April of 1998, plaintiff explained that she had previously been embarrassed when she had been called to assist at an incident at Novotny in which there were male students in various states of undress. She told Wojciechowski she thought it might be inappropriate for her to be a supervisor of the all-male dorm. According to plaintiff, in this conversation Dr. Wojciechowski told her that he was going to increase the tennis position to a .50 FTE.

According to plaintiff, after her April 13, 1998 conversation with Dr. Wojciechowski, the status of the Novotny assignment was still unresolved. In response to a letter from Lisa Miller, on May 6, 1998, plaintiff sent a letter requesting more time to consider the assignment. She also sent a memo to Dr. Wojciechowski on May 6th asking for his help on a parking ticket she had received when her dorm parking space had been blocked by construction and she parked illegally. On May 7, plaintiff met with Dr. Wojciechowski and Lisa Miller in the president's officer. Dr. Wojciechowski was angry about the parking ticket request and would not let plaintiff speak. He told her that the same rules applied to everybody and that she should pay the ticket. Dr. Wojciechowski also angrily discussed plaintiff's request for more time to make the Novotny decision, saying it was uncalled for. Wojciechowski said that if she did not take the reassignment then he and Ms. Miller would get together and decide whether she could remain as a tennis coach and teacher.

Plaintiff rejected the reassignment to Novotny. On May 11, 1998, Wojciechowski sent plaintiff a letter advising that her contract as Resident Hall Supervisor would not be renewed. The letter further said that "Because this position is tied directly to the Tennis Coach position as a means of making a more attractive compensation package, I am recommending to the Board of Trustees that its action to renew the tennis coach contract be rescinded at the May 18 Board of Trustees meeting." Plaintiff's tennis coaching contract offer had already been approved by PCC's Board of Trustees. In his deposition, Dr. Wojciechowski stated that the residence hall and tennis coach positions were a "package." He further said, "That's the way Penny was hired. That's the way we had chosen to advertise the job. . . ." Dr. Wojciechowski went before the Board and recommended rescission of the offer, citing plaintiff's rejection of the supervisor contract. The Board adopted the recommendation. Dr. Wojciechowski notified plaintiff of this action in a letter of May 19, 1998, in which he again stated that "[t]he tennis coach supplemental contract is tied directly to the residence hall supervisor contract which is the position of primary concern."

According to plaintiff, Dr. Wojciechowski had previously told her that he did not want coaches as dorm supervisors. Likewise, Debra Brant had heard other school officials, including Don Schwartz, Greg Morris and Janice English, say they did not want coaches to be dorm supervisors because their coaching duties took too much time away from the dorm.

Plaintiff testified that, to her knowledge, Dr. Wojciechowski never made disparaging comments about any female.

During the 1997–98 school year, athletic director Greg Morris told Debra Brant that PCC needed to prioritize athletics. She was told that men's and women's basketball, baseball and volleyball would be considered the major sports at PCC. This statement was made in response to Brant's complaint that women's athletics were not being properly funded.

When Jason Kennemer started at PCC in 1998 as head tennis coach, he also was the supervisor of Novotny Hall. He was in Novotny Hall for one year. During that year, Brant heard him complain frequently that he hated the dormitory and the tennis coaching job. In 1999, he was transferred to supervise the Scholarship Hall. He left his positions at PCC in May 2000.

## II. *Issues on Summary Judgment.*

Plaintiff contends she was paid lower wages than male coaches in equivalent positions, in violation of both the Equal Pay Act and Title VII, and that PCC engaged in sex discrimination when it terminated her contract to coach tennis.

PCC contends it is entitled to summary judgment on plaintiff's claim under the Equal Pay Act because plaintiff cannot show she was paid less than male employees performing substantially similar work. Even if she could, PCC contends the record shows that any disparities in compensation were due to legitimate business reasons. PCC contends that plaintiff likewise has no evidence to support a claim of sex discrimination under Title VII. It argues that plaintiff has no evidence that she was paid less than similarly situated male employees, and that its offer for plaintiff to coach the tennis team was rescinded after plaintiff declined the Novotny residence hall job because the coaching position was directly tied to the residence hall job.

## III. *Summary Judgment Standards.*

The standards and procedures for summary judgment are well established and will not be fully repeated here. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In essence, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Id.*

## IV. *Discussion.*

 A. *Equal Pay Act.* To establish an Equal Pay Act claim under 29 U.S.C. § 206(d)(1), a plaintiff has the burden of proving: (1) that she was performing work which was substantially equal to that of the male employees, considering the skills, duties, supervision, effort and responsibilities of the jobs; (2) the conditions where the work was performed were basically the same; and (3) the male employees were paid more under such circumstances. *Tidwell v. Fort Howard Corp.,* 989 F.2d 406, 409 (10th Cir.1993). If a prima facie case is established, then the burden is on the defendant to show that the wage disparity was due to one of the following reasons: (1) a seniority system; (2) a merit system; (3) a pay system based on quantity or quality of output; (4) a disparity based on any factor other than sex. *Id.*

 In attempting to support her Equal Pay Act claim, plaintiff cites evidence of what PCC paid male coaches in three other sports: cross country, track and field, and softball. *See* Pl.Mem. at 40. Plaintiff may well be correct that it is possible for different coaching positions to be "substantially equal" under the Act. But the evidence cited on summary judgment fails to show that the work plaintiff was performing was in fact substantially equal to the work involved in these other coaching positions. While PCC's functional description of the various coaching positions may have been essentially the same, there is uncontroverted evidence that the actual work required for these other positions involved skills and responsibilities not required in

plaintiff's job. For example, Brent Kirkhart, the head track and field and cross-country coach, was required to have knowledge of and to train athletes with respect to a large number of different track events. The track program typically had more participants than tennis and the head track and cross-country coach was also responsible for supervising an assistant coach. Kirkhart was responsible for coaching in conference competition in both the spring and fall, whereas tennis only had conference competition in the spring with a scrimmage season in the fall. These facts show there were substantial differences in the skills and responsibilities required for the tennis and cross country and track positions. Similarly, Ed Wilkerson, the head women's softball coach, typically had more athletes to supervise than plaintiff, was responsible for supervising an assistant coach, and was also responsible for a budget more than twice the size of the tennis budget. Softball also required more play dates than tennis did and placed responsibility for maintaining the field on the softball coach. The record discloses other differences in the positions as well, but the foregoing evidence alone does not permit a finding that the work involved in these other positions was substantially equal to plaintiff's position. In view of this shortcoming, plaintiff's Equal Pay Act claim fails as a matter of law.[3]

■ **B.** *Title VII.* Under the laws of the United States, it is unlawful for an employer to discriminate against an individual with respect to her terms, conditions, or privileges of employment because of such individual's sex. *See* 42 U.S.C. § 2000e–2. In addressing discrimination claims, courts ordinarily use the "burden-shifting" approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), under which the plaintiff must first establish a prima facie case of employment discrimination. If the plaintiff does so, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. If the defendant offers such a reason, the burden then reverts to the plaintiff to show that the defendant's proffered reason was a pretext for discrimination. *Id.* at 804–05, 93 S.Ct. 1817.

■ In a Title VII case, the plaintiff can establish a prima facie case by showing the following elements: 1) that she is a member of the class protected by the statute; 2) that she suffered an adverse employment action; 3) that she was qualified for the position at issue; and 4) that she was treated less favorably than others not in the protected class. *Sanchez v. Denver Public Schools*, 164 F.3d 527, 531 (10th Cir.1998).

■ With respect to any claim by plaintiff that PCC engaged in sex discrimination with respect to the wages or compensation it paid to her for coaching tennis, plaintiff has failed to make a prima facie showing. Although plaintiff contends she was paid less than certain other male coaches, she has not cited evidence to show that she was paid less than any similarly situated male coach. For the same reasons previously discussed with regard to the Equal Pay Act, plaintiff has not shown that the tennis coaching position was comparable to the track and cross-country or softball coaching positions. As such, any disparity in wages between these different positions does not give rise to an inference of sex discrimination. The only true comparison cited by plaintiff are the wages paid to the males who held the tennis coaching position both before and after

---

**3.** In view of the above finding, the court need not address the other arguments raised by the defendant, such as its contention that plaintiff was in fact paid more for coaching than Wilkerson. The court notes plaintiff's suggestion that the total compensation received by the other coaches should be compared for purposes of her Equal Pay Act claim. That argument fails, however, because there is no evidence that the non-coaching positions held by these other individuals were substantially equal to the residence hall supervisor position held by plaintiff.

her. This evidence shows that plaintiff initially received the same wage as her male predecessor (and subsequently received quite a bit more), and that her successor was paid the same annual wage as plaintiff.[4] These facts will not reasonably support a claim of sex discrimination insofar as wages are concerned.

■ Additionally, plaintiff has failed to make a prima facie case with respect to her allegation of discrimination in which she asserts that PCC gave "fluff" jobs to male coaches and difficult jobs to female coaches. As the court stated previously, the affidavit relied on by plaintiff in support of this allegation cannot sustain the claim because it has not been shown that Ms. Brant's conclusions are based on personal knowledge of the facts necessary to establish the claim. On top of this, plaintiff has cited no evidence that she was denied any particular supplemental position for which she expressed an interest and was qualified. A general allegation against the practices of PCC will not suffice; plaintiff must cite some evidence of discrimination in the terms, conditions or privileges of her own employment. For these reasons, plaintiff's Title VII claim with respect to employment in positions other than the tennis position also fails.

■ Plaintiff's final contention is that PCC's rescission of its offer to coach the tennis team was done on account of her sex. On this issue plaintiff has established a prima facie case of discrimination, inasmuch as she was treated less favorably than a prior male employee who had held the position and she was terminated and replaced by a male. PCC offers as its justification for rescinding the offer Dr. Wojciechowski's assertion that the tennis coaching contract was tied directly to the residence hall position that plaintiff decided not to take. Because this is a legitimate, non-discriminatory reason, the issue on summary judgment is whether the plaintiff has cited enough to create a genuine issue of fact as to whether this justification was a pretext for unlawful discrimination.

■ A plaintiff demonstrates pretext by showing either "a discriminatory reason more likely motivated the employer or ... that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). For example, a plaintiff may demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir.1997). However, a plaintiff's "mere conjecture that [her] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Branson v. Price River Coal Co.,* 853 F.2d 768, 772 (10th Cir.1988).

Viewing the evidence in the light most favorable to the plaintiff, the court concludes that a genuine issue of fact exists as to whether PCC's asserted reason was pretextual. Although there is clearly some evidence in the record to support PCC's assertion, there is also substantial evidence suggesting that the tennis coaching contract was not in fact tied directly to the residence hall position. For example, when plaintiff previously expressed dissatisfaction with the pay for the tennis job, Dr. Wojciechowski suggested that the school could get someone else to coach the tennis team, but he said nothing about plaintiff's residence hall job. Also, according to plaintiff, when she told Dr. Wojciechowski that she didn't think she wanted

---

4. Although plaintiff's successor received an additional $1,000 payment over and above what plaintiff had received for her work as the tennis coach and residence hall supervi-
sor, the uncontroverted evidence shows this supplemental payment occurred in an interim period before the successor's contract as the residence hall supervisor was to take effect.

**1052**

the assignment to Novotny Hall, he allegedly told her that he was going to increase the tennis position to a .50 FTE, which suggests that he considered these two positions to be separable. Also supporting such an inference is the fact that the PCC Board of Trustees approved the tennis coaching offer separate and apart from the residence hall contract. Finally, there is evidence in the record that PCC administrators including Dr. Wojciechowski expressed the view that they did not want athletic coaches to be residence hall supervisors because they were often absent. Like the evidence cited above, this appears to contradict the defendant's insistence after plaintiff declined the Novotny assignment that the tennis coaching job was tied directly to that position. In sum, a reasonable jury could find that the defendant's proffered reason for rescinding its offer of the tennis coaching position was a pretext. As the Supreme Court recently stated in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), a plaintiff's prima facie case, combined with sufficient evidence that the employer's asserted justification is false, may permit a jury to infer that the employer unlawfully discriminated. Accordingly, the defendant is not entitled to summary judgment insofar as plaintiff claims that the failure to rehire her for the tennis coach position was motivated by unlawful sex discrimination.

### V. Conclusion.

Defendant's Motion for Summary Judgment (Doc. 40) is GRANTED in part and DENIED in part as set forth above.